IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

G&G TIC, LLC,                        *

    Plaintiff,                       *

vs.                                  *         CASE NO. 4:07-CV-162(CDL)

ALABAMA CONTROLS, INC., SHAW         *
INFRASTRUCTURE, INC., TAC
AMERICAS, INC., and ROGER E.         *
REUSE,
                                     *
    Defendants.
                                     *

O R D E R

Presently pending before the Court are the following motions: Defendant TAC Americas, Inc.'s Motion to Dismiss; Defendant Shaw Infrastructure, Inc.'s Motion to Dismiss; the Motion to Dismiss of Defendants Alabama Controls, Inc. and Roger Reuse; and Plaintiff's Motion for Leave to Amend its Complaint.  For the reasons set forth below, TAC's Motion to Dismiss (Doc. 22) is **granted**; Shaw's Motion to Dismiss (Doc. 29) is **granted**; and the Motion to Dismiss of ACI and Roger Reuse (Docs. 24 & 34) is **granted**.  Plaintiff's Motion for Leave to Amend the Complaint (Doc. 47) is **denied**.

FACTUAL BACKGROUND

In reviewing this motion to dismiss for failure to state a claim, the Court must take the allegations in the Complaint as true.

1

*Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006).  Plaintiff alleges the following:[1]

Plaintiff, which is operated by Gene and Greg Garner, installs and maintains direct digital control ("DDC") systems for buildings and facilities.  (Am. & Recast Compl. ¶ 7 [hereinafter Compl.].)  DDC systems enable remote control of a building's heating and cooling systems.  (*Id.*)  Plaintiff performed DDC contract work at Fort Benning in Columbus, Georgia.  (*Id.* ¶ 8.)  Fort Benning's Directorate of Public Works ("DPW") oversees, manages and lets contracts for DDC work at Fort Benning through its agent, Defendant Shaw Infrastructure, Inc. ("Shaw").  (*Id.* ¶¶ 31, 38, 68.)

Defendant TAC Americas, Inc. ("TAC") manufactures DDC equipment, and Plaintiff has a non-exclusive contract with TAC for sales of equipment within 100 miles of Columbus, Georgia.  (*Id.* ¶¶ 16-17; Ex. 1 to TAC's Memo. in Supp. of Mot. to Dismiss ¶ VII [hereinafter TAC Contract].)[2]  TAC has two lines of DDC equipment: TAC Vista and Invensys. (*Id.* ¶¶ 17-18.)  Plaintiff used TAC Vista equipment, while

---

[1]The Defendants seek dismissal of Plaintiff's Amended and Recast Complaint, filed on December 18, 2007.  After the Court held a hearing on Defendants' motions to dismiss, Plaintiff filed a motion to amend its Complaint and submitted a proposed Second Amended and Recast Complaint. The allegations set forth in this Order are generally the allegations of the Amended and Recast Complaint, but the Court also includes allegations from the Second Amended and Recast Complaint if they are relevant to Plaintiff's motion to amend its Complaint.

[2]The Court may consider the TAC Contract, which is attached to TAC's Motion to Dismiss, at the motion to dismiss stage because the document is central to Plaintiff's claim and the authenticity is not challenged. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

Plaintiff's competitor, Defendant Alabama Controls, Inc. ("ACI"), which also performed DDC contract work at Fort Benning, used Invensys equipment. (*See id.* ¶¶ 20, 23.)   Defendant Reuse worked for ACI. (*See id.* ¶ 21.)   Other DDC contractors at Fort Benning included Johnson Controls, Inc. and Honeywell. (*Id.* ¶¶ 15, 68.)

Plaintiff contends that ACI, Shaw and TAC conspired to defraud the government, specifically DPW, into paying inflated prices for DDC systems by creating a bidding scheme under which ACI would be the preferred (and more expensive) choice to install and maintain DDC systems at Fort Benning, to the exclusion of Plaintiff. (*See generally id.*)   The alleged scheme worked in several different ways. First, Plaintiff contends that Defendants inserted a bogus bid requirement that effectively sole-sourced certain projects to ACI. In April and May 2007, TAC and ACI created a "factory authorized" designation for Invensys equipment, and TAC granted ACI, but not Plaintiff, the "factory authorized" designation. (*Id.* ¶¶ 23-24.) Shaw and ACI then added the "factory authorized" term to bid requirements for DDC work at Fort Benning, and ACI was the only "factory authorized" dealer of TAC Invensys equipment.[3]  (*Id.* ¶ 25.) Shaw awarded Plaintiff no contracts for DDC work after May 2007.

---

[3]DPW did not require the "factory authorized" designation, and DPW demanded that Shaw delete this bid requirement.   However, Plaintiff contends that Shaw ignored DPW's demands.  (Compl. ¶ 32.)   During May 2007, Johnson Controls was awarded a contract for DDC work at Fort Benning even though, according to Plaintiff, ACI was the only "factory authorized" contractor.   (Compl. ¶¶ 25, 44; Proposed 2d Am. & Recast Compl. [hereinafter 2d Am. Compl.] ¶ 88.)

(*Id.* ¶ 31.)   Second, TAC threatened in September 2006 not to sell Plaintiff any DDC equipment for its other customers if Plaintiff bid on Fort Benning projects—even though TAC was aware that DPW had specifically requested that Plaintiff submit a bid on at least one of the projects.   (*Id.* ¶¶ 39-41, 53-54, 95; Proposed 2d Am. & Recast Compl. ¶ 88. [hereinafter 2d Am. Compl.])   Third, Shaw leaked Plaintiff's bids to ACI, and ACI undercut Plaintiff's price but then charged more for its work by submitting change orders.   (Compl. ¶¶ 45, 62-65.) Fourth, Shaw, ACI and TAC provided false information about Plaintiff, which resulted in Plaintiff losing contracts it had already won.[4]   (*Id.* ¶ 44.)   Plaintiff alleges that it lost business as a result of the scheme, including (1) a contract that Plaintiff was unable to complete due to the alleged acts of defendants (*id.* ¶¶ 47-51), (2) bids that Plaintiff won, but then the contract was awarded to another company (*id.* ¶¶ 44, 55-56, 64-65), (3) bids that Plaintiff was not allowed to make (*id.* ¶¶ 52-54), and (4) bids that

---

[4]In one instance, Shaw withdrew a contract from Plaintiff and awarded it to Johnson Controls because Defendants provided false information regarding Plaintiff's ability to tie TAC Vista components to Invensys equipment. (Compl. ¶ 44.) Specifically, Alabama Controls personnel told Shaw and DPW that TAC Vista components were not compatible with Invensys equipment that had previously been installed at Fort Benning and that Plaintiff could not tie in TAC Vista equipment with Invensys equipment. (Compl. ¶¶ 20, 27.) However, Plaintiff contends that it demonstrated to DPW that it *could* tie in TAC Vista equipment with Invensys equipment. (*Id.* ¶ 22.) In another instance, a contractor removed Plaintiff from a project after TAC personnel told the contractor that Plaintiff owed TAC $90,000 (which was not true) and that TAC would not sell any more parts to Plaintiff until it received the money. (*Id.* ¶¶ 47-51.)

were won by someone other than Plaintiff (*id.* ¶¶ 42-43, 45-46, 57-63, 66).

It is unclear from the Amended and Recast Complaint when Plaintiff submitted (or was not permitted to submit) bids for each of the twelve projects at issue. Plaintiff's proposed Second Amended and Recast Complaint ("Proposed Amended Complaint") does cure this defect by alleging the dates when ACI submitted bids. (2d Am. Compl. ¶ 88.) In addition, Plaintiff's Proposed Amended Complaint specifically alleges that ACI submitted the bids "via electronic mail, facsimile, telephone or a combination of these means[,]" curing the Amended and Restated Complaint's silence on how Defendants used the wires in furtherance of their alleged scheme.[5] (2d Am. Compl. ¶ 97.)

Plaintiff contends that the acts of Shaw, TAC and ACI to exclude Plaintiff from DDC work at Fort Benning violated the Federal Acquisition Regulations ("FAR"). FAR contains requirements regarding competitive bidding and justification for "sole sourcing." (*Id.* ¶¶ 35-36.) According to Plaintiff, Shaw effectively sole-sourced certain work to ACI without justification under FAR, thereby

---

[5]The Proposed Amended Complaint also contains the general allegation that "[t]he acts of TAC, Shaw and [ACI] . . . were and are facilitated by those parties' use in interstate commerce of the mails." (2d Am. Compl. ¶ 102.) However, it does not contain any specific allegations regarding how the Defendants used the mails in furtherance of their alleged scheme. Therefore, the Court only considers Plaintiff's wire fraud claims. As discussed below, even if Plaintiff had made specific allegations regarding Defendants' use of the mails, Defendant has not adequately alleged that Defendants' alleged scheme proximately caused Plaintiff's injuries.

defrauding the government and increasing the costs to the government for DDC work. (*Id.* ¶¶ 37, 73.) Plaintiff alleges that it relied upon Defendants' representations respecting their adherence to FAR and that Defendants' failure to adhere to FAR resulted in damage to Plaintiff. (*Id.* ¶¶ 74-75, 83-84.) Plaintiff further alleges that Defendants deprived Plaintiff of property by use of threats of economic harm. (*Id.* ¶ 96.)

Plaintiff brings claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, predicated on violations of the following statutes: federal wire fraud, 18 U.S.C. § 1343 (Compl. ¶¶ 67-78); federal mail fraud, 18 U.S.C. § 1341 (*id.* ¶¶ 79-87); and Hobbs Act, 18 U.S.C. § 1951 (*id.* ¶¶ 92-100).[6] Plaintiff also brings a RICO conspiracy claim under 18 U.S.C. § 1962(d). In addition, Plaintiff brings state law claims against Defendants under Georgia RICO, O.C.G.A. § 16-14-4 (Compl. ¶¶ 105-109). Plaintiff further claims that Defendants tortiously interfered with Plaintiff's contracts (*id.* ¶¶ 116-135) and that TAC breached its contract with Plaintiff (*id.* ¶¶ 110-115).[7]

---

[6]Initially, Plaintiff also asserted a RICO claim predicated upon bank fraud. That claim has since been dismissed. (Order Granting Pl.'s Mot. to Dismiss RICO claim based upon bank fraud, Apr. 25, 2008.)

[7]Plaintiff's state law claims are before this court based on diversity jurisdiction. *See* 28 U.S.C. § 1332.

DISCUSSION

## I.   Defendants' Motions to Dismiss

### A.   Motion to Dismiss Standard

When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in Plaintiff's Complaint and limit its consideration to the pleadings and exhibits attached thereto. *Thaeter*, 449 F.3d at 1352; see also *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (to state a claim, a complaint must contain "enough factual matter (taken as true) to suggest" the required element). Although "'[f]actual allegations must be enough to raise a right to relief above the speculative level[,]'" "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable[.]'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965).

### B.   Federal RICO Claims

The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of RICO's criminal provisions. 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(b), it is illegal "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign

7

commerce." Under 18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To establish a federal civil RICO violation under § 1962(b) or (c), Plaintiff must show (1) investment in, control of or conduct of (2) "an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (per curiam) (citations and internal quotation marks omitted). In this civil case, Plaintiff must also satisfy the requirements of 18 U.S.C. § 1964(c) and show that it (1) suffered injury to "business or property" and (2) that injury was "by reason of" the substantive RICO violation. *Id.* at 1283.

Racketeering activity is any act "which is indictable" under federal law and specifically includes mail fraud, wire fraud, and Hobbs Act extortion. 18 U.S.C. § 1961(1). A pattern of racketeering activity "'is shown when a racketeer commits at least two distinct but related'" acts of racketeering, or predicate acts. *Williams*, 465 F.3d at 1283 (quoting *Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001)). The plaintiff must show that it was injured "by reason of" the pattern of racketeering activity, which means that the plaintiff must show (1) proximate cause and (2) a sufficiently direct injury so that the plaintiff has standing to sue. *Id.* at 1287.

The Supreme Court in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) made it clear that "courts should scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations." *Williams*, 465 F.3d at 1287. In evaluating proximate cause, the courts must ask "whether the alleged violation led directly to the plaintiff's injuries." *Anza,* 547 U.S. at 461. "A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* at 460. Rather, "there must be 'some direct relation' between the injury alleged and the injurious conduct in order to show proximate cause." *Williams*, 465 F.3d at 1288 (quoting *Anza*, 547 U.S. at 457). A motivating principle behind the directness requirement is that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 269 (1992). In addition, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* The test for RICO standing "is whether the alleged injury was directly caused by the RICO violation, not whether such

harm was reasonably foreseeable." *Williams*, 465 F.3d at 1291 (quotation marks and citation omitted).

### 1.   Wire Fraud Claims

Plaintiff contends that it was injured by reason of Defendants' pattern of wire fraud.  Plaintiff correctly asserts that in wire fraud cases, there is no requirement that a plaintiff itself rely upon a misrepresentation, but the plaintiff must show that it was injured as a direct result of the fraud. *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2144 (2008).  Plaintiff must still satisfy the proximate cause principles articulated in *Anza*. *Id.* This requires allegations that *someone* relied upon a misrepresentation by the defendants and that the reliance directly caused harm to the plaintiff. *Id.*

Plaintiff's wire fraud claims appear to be based on a bid rigging scheme involving two types of FAR violations.  First, Plaintiff contends that it was the target of a "sole source" bid scheme under which the contract specifications for three projects were written to require a "factory authorized" designation, which ACI had but Plaintiff did not.  (Compl. ¶¶ 42-43, 52, 55-56.)  Second, Plaintiff complains that Defendants violated FAR when Shaw leaked Plaintiff's bids to ACI, then ACI undercut Plaintiff's price and later charged the government additional fees by submitting change

orders.[8]   (*Id.* ¶¶ 45, 62-65.)   However, Plaintiff has not alleged sufficient facts to show that the injury for which Plaintiff seeks redress—the "substantial destruction" of its business—was proximately caused by Defendants' alleged wire fraud.   Here, the primary target of the alleged scheme was the government, which paid higher prices for DDC contractor services than it would have if the bids had not been rigged.   (*E.g.*, *id.* ¶ 73.)   Plaintiff is an indirect victim of this alleged scheme.

In similar cases, where the plaintiff is not the direct fraud victim, the courts have been reluctant to find proximate cause.   For example, in *Anza*, the defendant committed fraud on the New York tax department by not charging its customers sales tax and then submitting false tax returns.   547 U.S. at 457-58.   As a result, the direct victim, the state, lost sales tax revenue.   *Id.* at 458.   The plaintiff, the defendant's competitor, claimed that it lost business because the defendant was able to offer lower prices since it was not charging sales tax.   *Id.* The Supreme Court found that the cause of the plaintiff's injury—lower profits and lost business—was entirely

---

[8]Plaintiff also alleges that Defendants provided false information about Plaintiff to DPW and another contractor, resulting in Plaintiff's loss of contracts.   However, Plaintiff alleges that DPW did not believe Defendants' misrepresentations (*see* Compl.¶¶ 22, 95), so Plaintiff has not adequately alleged that DPW relied upon the misrepresentations or that the misrepresentations to DPW caused injury.   This leaves TAC's alleged misrepresentation to another contractor.   While this type of misrepresentation may well be actionable under RICO, *see Bridge*, 128 S. Ct. at 2139, there is no allegation that TAC made the misrepresentation via the mail or wires and, standing alone, this allegation is not sufficient to establish a scheme or pattern of mail or wire fraud.

distinct from the alleged RICO violation—fraud on the government. The Court concluded that the plaintiff's lost sales could have resulted from factors *other than* the defendant's alleged tax fraud. *Id.* at 458-59.  Because causation was speculative, the Court could not find that the alleged RICO violation proximately caused the damages.  *Id.* at 459-60.  In addition, the Court noted that the government was the proper party to recover for the fraud.  *Id.* at 460.

In another similar case, the Seventh Circuit ruled that the plaintiff could not show that its injuries were proximately caused by the defendant competitor's bid rigging. *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403-04 (7th Cir. 2006).  The defendants engaged in a bid-rigging scheme to defraud the Wisconsin Department of Transportation ("WisDOT").  As a result, WisDOT had to pay higher prices for its work because one of the two defendants always got the bids by slightly undercutting their competitors.  *Id.* at 398-99.  The court found no proximate cause because it "could never be certain whether [the plaintiff] would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'"  *Id.* at 403 (quoting *Anza*, 547 U.S. at 458).  The court concluded that the defendant could have won

bids without the bid-rigging scheme, and the plaintiff could not show that its lost business as a result of the bid-rigging scheme.  *Id.*[9]

Plaintiff contends that *Anza* and *James Cape* do not apply here and that *Bridge* and *Williams* are more on point.  In *Bridge*, the plaintiff was a regular bidder in Cook County's tax lien auction, and the defendants were a principal and its agents, who were also regular bidders in the auction.  Since the bidding generally resulted in a tie, the county allocated parcels on a rotational basis to ensure that liens were apportioned fairly among the bidders.  *Bridge*, 128 S. Ct. at 2135.  To prevent bidders from gaining a disproportionate share of liens, the county had a "Single Simultaneous Bidder Rule," which prohibited bidders from using agents to submit simultaneous bids for the same parcel.  The plaintiff alleged that the defendants violated the Single Simultaneous Bidder Rule, thus gaining a disproportionate share of liens, to the plaintiff's detriment.  *Id.*

---

[9] *See also Holmes*, 503 U.S. at 268-69 ("[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.").  In *Holmes*, the defendant defrauded brokers with a stock manipulation scheme.  503 U.S. at 262-63.  Some of the brokers were not able to meet obligations to their customers, thus triggering plaintiff's duty to reimburse the customers.  *Id.*  The plaintiff sought to recover from the defendant, arguing that the customers' losses (and, thus, the plaintiff's obligation to reimburse the customers) were caused by the defendant's stock manipulation scheme.  *Id.*  The Supreme Court found that the customer harm was purely contingent on the brokers' harm and that the defendant's conduct did not proximately cause the customers' injury.  *Id.* at 272-73.  The Court offered several reasons for this decision. First, if the plaintiff were permitted to sue, the district court would have to determine if its loss was the result of the conspiracy or some other reason.  *Id.* at 273.  Second, the court would have to apportion recoveries to two sets of injured parties.  *Id.*  Finally, the directly injured parties could bring suit to recover. *Id.* at 273-74.

at 2135-36.  The Supreme Court concluded that the plaintiff was injured directly because the loss of liens was a foreseeable and natural consequence of the defendants' scheme to obtain more liens for themselves.  Because of the rotation system, the plaintiff would have obtained more liens but for the defendants' violation of the Single Simultaneous Bidder Rule.  *Id.* at 2144.  There is an important distinction between this case and *Bridge*: in *Bridge*, the plaintiff and other losing bidders "were the *only* parties injured by [the defendants'] misrepresentations."  *Id.*

In *Williams*, legal hourly employees of the defendant alleged that the defendant employed large numbers of illegal workers, allowing the defendant to depress the wages paid to its hourly workers, including legally employed workers who would be paid higher wages if the defendant did not engage in illegal hiring practices. *Williams*, 465 F.3d at 1289.  The defendant's "widespread scheme of knowingly hiring and harboring illegal workers ha[d] the purpose and direct result of depressing the wages paid to [legal workers]. Simply put, wholesale illegal hiring depresse[d] wages for the legal workers . . . where [the defendant] is located."  *Id.* Distinguishing *Anza* and *Holmes*, the *Williams* court found that the legal workers' injury was *not* merely derivative of a prior injury to third parties: "There is no more direct injured party who could bring this suit." *Id.* at 1290 (noting that Congress criminalized employment of illegal workers in part to protect legal workers).

The Court concludes that this case is more analogous to *Anza* and *James Cape* than it is to *Bridge* and *Williams*. Plaintiff acknowledges that the purpose of Defendants' alleged scheme was to defraud the government, and Plaintiff contends that the scheme's other purpose was to destroy Plaintiff's business. However, there is a party more directly injured than Plaintiff: the government. Furthermore, Plaintiff's own allegations cast doubt upon Plaintiff's contention that it lost business as a result of Defendants' scheme to award DDC work exclusively to ACI because ACI did not win all of the contracts. (Compl. ¶ 44.) Accordingly, under proximate cause principles articulated in *Anza*, the Court concludes that Plaintiff's wire fraud claims do not satisfy the requirement of proximate causation. Therefore, Plaintiff's wire fraud claims are dismissed.

### 2. Hobbs Act Claims

Plaintiff's Hobbs Act claims are based upon TAC's alleged threat in September 2006 not to sell Plaintiff any DDC equipment for its other customers if Plaintiff bid on Fort Benning projects. (*Id.* ¶¶ 39-41, 53-54, 95; 2d Am. Compl. ¶ 88.) The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The right to solicit customers is considered "property" for purposes of the Hobbs Act. *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969); *see also Scheidler v. Nat'l Org. for*

15

*Women, Inc.*, 537 U.S. 393, 402 & n.6 (2003) (suggesting that Hobbs Act liability could be based on the intangible right to solicit customers). However, Plaintiff's allegations do not establish that Plaintiff was injured *by reason of* extortion. The allegations in Plaintiff's Complaint (and Proposed Amended Complaint) are inconsistent with Hobbs Act liability: the Complaint suggests that Plaintiff *was not* induced to stop bidding on Fort Benning projects because Plaintiff submitted at least five bids for Fort Benning DDC work *after* TAC allegedly made its threats. (*See* 2d Am. Compl. ¶ 88.) Therefore, the Court finds that Plaintiff's claim for Hobbs Act extortion is not plausible on its face, and that claim is accordingly dismissed. *See, e.g., Twombly*, 127 S. Ct. at 1974 (a complaint must "state a claim to relief that is plausible on its face").

   3.   *Conspiracy Claim*

   Since Plaintiff's Complaint fails to state a substantive RICO claim, Plaintiff's RICO conspiracy claim also fails. *See* 18 U.S.C. § 1962(d); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1259, 1269 (11th Cir. 2004) (allegation that defendant conspired to commit conduct which does not constitute a RICO violation is not sufficient to state a RICO conspiracy claim).

   C.   Plaintiff's State Law Claims

   1.   *Georgia RICO Claims*

   Plaintiff contends that its allegations of racketeering activity in violation of the federal RICO statutes also give rise to claims

16

under Georgia's RICO statutes. *See* O.C.G.A. § 16-14-4 (mirroring Federal RICO's "prohibited activities" section, 18 U.S.C. § 1962(b)-(d)); O.C.G.A. § 16-14-3(9)(A)(xxix) ("'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit . . . "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961 (1)(A), (B), (C), and (D)[.]"). Like federal RICO, Georgia RICO provides that "any person" who is "injured by reason of" a violation of Georgia RICO's criminal provisions. Because Georgia RICO is modeled after federal RICO, Georgia courts consider federal authority to be persuasive in interpreting Georgia RICO. *Williams Gen. Corp. v. Stone*, 279 Ga. 428, 430, 614 S.E.2d 758, 760 (2005). Georgia courts employ the *Anza* "proximate cause" standard to determine whether a plaintiff's injury is "by reason of" a RICO predicate act. *Am. Ass'n of Cab Cos., Inc. v. Parham*, 291 Ga. App. 33, 39, 661 S.E.2d 161, 166-67 (2008) (citing *Anza*, 547 U.S. at 456-57). As discussed above, Plaintiff has not sufficiently alleged that its injuries were "by reason of" a RICO predicate act. Accordingly, Plaintiff's Georgia RICO claims are dismissed.

2.   *Breach of Contract Claim Against TAC*[10]

Plaintiff contends that TAC breached its contract with Plaintiff when it threatened not to sell Plaintiff any DDC equipment for its other customers if Plaintiff bid on Fort Benning projects.[11] (*E.g.*, Compl. ¶¶ 39-41, 111, 113.)   Plaintiff contends that its agreement with TAC was a requirements contract such that TAC was required to supply Plaintiff's reasonable requirements of DDC equipment. Plaintiff has not pointed the Court to any contract provisions in support of this argument, and the Court's review of the contract reveals none; there is no promise by Plaintiff to purchase exclusively from TAC its requirements of DDC equipment.   Therefore, the TAC Contract is not a requirements contract.   *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 963 (5th Cir. 1999) (applying Texas law and noting that an essential element of a requirements contract is "the promise of the buyer to purchase exclusively from the seller"); *Billings Cottonseed, Inc. v. Albany*

---

[10]TAC argues primarily that it did not breach its contract with Plaintiff.   In the alternative, TAC argues that it is entitled to dismissal because Plaintiff failed to comply with contract provisions requiring pre-suit notice of claims and arbitration.   TAC also argues that a forum selection clause requires Plaintiff's breach of contract claims to be brought in Dallas County, Texas.   Because Plaintiff claims that TAC repudiated the contract and that TAC therefore cannot enforce the contract's "Disputes" provision, the Court will examine whether Plaintiff's complaint sufficiently alleges a breach of contract.

[11]Plaintiff also alleged that TAC breached the contract when it agreed to supply parts to ACI for work at the National Infantry Museum.   (Compl. ¶¶ 112, 114.)   Plaintiff abandoned that position in the Proposed Amended Complaint.   Therefore, the Court will only consider the breach of contract claims related to TAC's alleged refusal to sell parts and equipment to Plaintiff.

*Oil Mill, Inc.* 173 Ga. App. 825, 826, 328 S.E.2d 426, 429 (1985) (noting that without buyer's promise to obtain goods exclusively from the seller, there is no requirements contract but "merely an invitation for orders.").[12]

Furthermore, the TAC Contract provides that Plaintiff's territory is "non-exclusive" and specifically states that Plaintiff is not permitted to sell DDC equipment to certain customers "reserved for sales and support as directed by TAC" (TAC Contract ¶ VII), that TAC can periodically update its "reserved" customer list (*id.*), and that TAC can deny shipment of products if Plaintiff has not met certain conditions (*E.g.*, TAC Contract ¶ V).  For these reasons, the Court concludes that TAC did not breach the TAC Contract when it threatened not to sell Plaintiff DDC equipment for its other customers if Plaintiff bid on Fort Benning projects.  Accordingly, Plaintiff's breach of contract claim is dismissed.

---

[12]The TAC Contract contains a choice of law provision specifying that Texas law applies to disputes arising out of the Contract.  (TAC Contract ¶ XVIII.)  The parties have not addressed the question whether Georgia law or Texas law applies to the requirements contract question, but the Court need not decide that issue because the law of both Texas and Georgia requires exclusivity to form a requirements contract and there is no exclusive dealing term in the TAC Contract.  While the TAC Contract does require Plaintiff to make a "Minimum Annual Purchase" of certain types of DDC equipment (TAC Contract ¶ III), there is no allegation that TAC did not fulfill Plaintiff's orders for the Minimum Annual Purchase.

### 3.   *Tortious Interference With Contract*

Plaintiff claims that TAC tortiously interfered with Plaintiff's contract with Caddell Construction ("Caddell").[13]   (Compl. ¶¶ 116-122.)   Plaintiff also contends that Shaw, ACI and Reuse interfered with Plaintiff's business or contractual relationship with DPW. (Compl. ¶¶ 123-135.)   As discussed below, these claims are dismissed.

#### i.   CADDELL CONSTRUCTION CONTRACT

Plaintiff's tortious interference claim against TAC arises from TAC's alleged interference with a contract between Plaintiff and Caddell Construction.   Plaintiff alleges that Caddell awarded Plaintiff DDC work for Kelly Hill barracks at Fort Benning.   (Compl. ¶ 47.)   Plaintiff further alleges that TAC informed a Caddell representative that Plaintiff owed TAC $90,000[14] for parts and equipment on the Kelly Hill barracks project and that until Plaintiff paid that amount TAC would not supply any more parts or equipment to Plaintiff or honor its warranty on TAC equipment installed in Kelly Hill barracks.   (Compl. ¶ 48.)   After TAC made this representation to Caddell, Caddell terminated Plaintiff from the project and hired ACI to complete the DDC work on Kelly Hill barracks.   (*Id.* ¶ 50.)

---

[13]The Court notes that Plaintiff alleges that Plaintiff's surety brought a lawsuit against Plaintiff in state court related to the Caddell project.   (Compl. ¶ 51.)   There is no allegation that Plaintiff's tortious interference claims related to the Caddell project are being litigated in that proceeding, and there is no abstention argument before the Court.

[14]Plaintiff contends this representation is false and that it owed TAC only $10,000 for parts and equipment on the Kelly Hill barracks project. (Compl. ¶ 50.)

To prove tortious interference with contract or business relations, Plaintiff must prove:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. . . .

*J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 557, 644 S.E.2d 440, 446 (2007). "For purposes of this type of tort, 'privilege' means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that it is not considered a stranger, interloper, or meddler." *Disaster Servs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 741, 492 S.E.2d 526, 529 (1997).

To be liable for tortious interference, TAC must be a "stranger to the business relationship giving rise to and underpinning the contract." *Benefit Support, Inc. v. Hall County*, 281 Ga. App. 825, 830, 637 S.E.2d 763, 769 (2006) (emphasis omitted) (internal quotation marks omitted). A party with a "direct economic interest in the contract" is not a stranger, and neither are parties to "an interwoven contractual arrangement[.]" *LaShonde v. Chase Mortgage Co.*, 259 Ga. App. 772, 773, 577 S.E.2d 822, 824 (2003). Here, Plaintiff alleges that it sold and installed TAC equipment in the Kelly Hill barracks under a contract that obligated Plaintiff "to diligently pursue sales for TAC systems," to install and service

21

those systems, and to develop market share for TAC.[15] (TAC Contract ¶ VII.)   Accordingly, the Court concludes that Plaintiff's allegations do not establish that TAC was a stranger to Plaintiff's business relationship with Caddell, and Plaintiff's tortious interference claims against TAC related to the Caddell contract are dismissed.

ii.  DPW RELATIONSHIP

Plaintiff alleges that Shaw tortiously interfered with Plaintiff's relationship with DPW respecting DDC work at Fort Benning in a number of ways.   However, Plaintiff does not sufficiently allege that Shaw was a stranger to the business relationship between Plaintiff and DPW.   Rather, Shaw was intimately involved in the relationship because Shaw was DPW's "contracted management agent" responsible for "administration and awarding of DDC contracts," and Shaw's compensation was tied to the contracts it let.  (Compl. ¶¶ 38, 68.)  *See Heery/Mitchell*, 284 Ga. App. at 557, 644 S.E.2d at 446-47 (finding that construction manager was not a stranger to the contract and business relationship between contractor and subcontractors);

---

[15]Plaintiff asserts that TAC disclaimed any relationship between itself and Caddell.  In support of this argument, Plaintiff points to a contractual provision defining the relationship between Plaintiff and TAC. (TAC Contract ¶ XV.)  In summary, the provision provides that TAC sells its products to Plaintiff and that Plaintiff resells them such that matters related to resales are generally between Plaintiff and its customer, not TAC and the customer.  (*Id.*)  The provision does not change the fact that Plaintiff agreed to pursue sales for TAC systems, that Plaintiff was selling and installing TAC systems in Kelly Hill barracks and that TAC had an economic interest in Plaintiff's sales and support of TAC equipment.

*Benefit Support, Inc.*, 281 Ga. App. at 831, 637 S.E.2d at 770 (finding that county's contract consultant was not a stranger to the relationship between the county and a contract bidder). Therefore, the Court dismisses Plaintiff's tortious interference claims against Shaw.

In addition to Plaintiff's claims regarding Shaw, Plaintiff also alleges that ACI and Reuse interfered with its business relationship with DPW by providing DPW with false information regarding Plaintiff's technical capabilities. (*E.g.*, Compl. ¶¶ 130-131.) Even assuming that the alleged statements by ACI and Reuse are not permissible competition activities, Plaintiff has not alleged that these statements interfered with Plaintiff's relationship with DPW. Rather, Plaintiff's Complaint specifically alleges that DPW did not believe the statements by ACI and Reuse because Plaintiff demonstrated its technical abilities to DPW's satisfaction and because DPW requested that Plaintiff bid on projects. (*See* Compl. ¶¶ 22, 95.)

## II. Plaintiff's Motion for Leave to Amend the Complaint

Plaintiff seeks leave to amend its Amended and Recast Complaint. Although leave to amend "shall be freely given when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court is not required to grant leave to amend if the amendments are futile.[16] *Spanish Broad.*

---

[16]The Court is also not required to permit amendments if they would result in undue prejudice to the opposing party or if the plaintiff failed to cure deficiencies in previous amendments. *Spanish Broad. Sys. of Fla.,*

*Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As discussed below, the Court finds that Plaintiff's proposed amendments are futile and therefore denies Plaintiff's Motion for Leave to Amend the Complaint.

A.   RICO Claims

Plaintiff's Proposed Amended Complaint contains more specific allegations regarding, among other things, (1) when the bids at issue were submitted and (2) Plaintiff's reliance in support of Plaintiff's mail and wire fraud claims.  As discussed above, Plaintiff's RICO claims—even considering the proposed new allegations—fail. Accordingly, Plaintiff's attempt to amend its Complaint with regard to these claims is futile.

B.   Breach of Contract Claim

Plaintiff's Proposed Amended Complaint clarifies Plaintiff's position that the TAC Contract is a requirements contract and points to specific contractual provisions in support of that argument.  (2d Am. Compl. ¶ 136.)  However, none of those provisions establishes the existence of a requirements contract because none of the provisions contains a promise by Plaintiff to purchase exclusively from TAC its requirements of DDC equipment.  Accordingly, the Proposed Amended Complaint cannot save Plaintiff's breach of contract claims.

---

*Inc.*, 376 F.3d at 1077.  The Court notes that this is Plaintiff's second amendment to the Complaint and that Plaintiff apparently did not believe its Amended Complaint was deficient until *after* it engaged in a colloquy with the Court during the hearing on Defendants' Motions to Dismiss.

C.   Tortious Interference With Contract Claims

   1.   *Claim Against Shaw Related to the Caddell Contract*

In its Proposed Amended Complaint, Plaintiff alleges that Shaw tortiously interfered with Plaintiff's contract with Caddell. Specifically, Plaintiff contends that the project was not administered by DPW and that Caddell, not Shaw, let the contract. (2d Am. Compl. ¶ 48.)   Thus, according to Plaintiff's Proposed Amended Complaint, it appears that Plaintiff sufficiently alleged that Shaw was a stranger to the Caddell contract. However, Plaintiff has not sufficiently alleged that Shaw "induced a breach of contractual obligations" or proximately caused Plaintiff's injuries. Plaintiff alleges that TAC made misrepresentations to Caddell and that Caddell terminated Plaintiff from the Kelly Hill barracks project because, based on those misrepresentations, Caddell believed that Plaintiff would default on its performance bond. (2d Am. Compl. ¶¶ 49-50.) Around the same time, Plaintiff alleges, Shaw introduced Caddell to ACI as a candidate to finish the project. (2d Am. Compl. ¶ 49.)   However, there are no allegations that, but for Shaw's promotion of ACI to Caddell, Caddell would not have terminated the contract with Plaintiff. *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832, 662 S.E.2d 880, 884 (2008) ("[A]ny damage claimed to have been suffered by a plaintiff does not proximately result from the defendants' alleged misconduct, if the damage would have occurred notwithstanding their misconduct."). For these reasons, Plaintiff's

25

Proposed Amended Complaint cannot save Plaintiff's tortious interference claims against Shaw with regard to the Caddell contract.

>    *2.    Claims Against TAC Related to DPW*

Plaintiff alleges in its Proposed Amended Complaint that TAC improperly interfered with Plaintiff's relationship with DPW. (*E.g.*, 2d Am. Compl. ¶ 152.)  Just as Plaintiff's allegations do not establish that TAC was a stranger to Plaintiff's business relationship with Caddell, Plaintiff's allegations do not establish that TAC was a stranger to Plaintiff's business relationship with DPW.  Accordingly, Plaintiff's proposed amendment regarding TAC's interference with the relationship between Plaintiff and DPW is futile.

CONCLUSION

As discussed above, TAC's Motion to Dismiss (Doc. 22) is **granted**; Shaw's Motion to Dismiss (Doc. 29) is **granted**; and the Motion to Dismiss of ACI and Roger Reuse (Docs. 24 & 34) is **granted**. Plaintiff's Motion for Leave to Amend the Complaint (Doc. 47) is **denied**.  Accordingly, this entire action is hereby dismissed.


IT IS SO ORDERED, this 29th day of September, 2008.


>                   S/Clay D. Land
>                   ────────────────────────────
>                     CLAY D. LAND
>                   UNITED STATES DISTRICT JUDGE